Gloria C. PINCZKOWSKI and Leroy S. Pinczkowski, Plaintiffs-Appellants-Petitioners,

v.

MILWAUKEE COUNTY, Defendant-Respondent.

Gloria C. PINCZKOWSKI, Plaintiff-Appellant-Petitioner,

v.

MILWAUKEE COUNTY, Defendant-Respondent.

Supreme Court

*Nos. 2003AP1732 & 2003AP2127. Oral argument October 7, 2005.—Decided December 1, 2005.*

2005 WI 161

(Also reported in 706 N.W.2d 642.)

For the plaintiffs-appellants-petitioners there were briefs by *Alan Marcuvitz, Andrea H. Roschke,* and *Michael Best & Friedrich LLP,* Milwaukee, and oral argument by *Alan Marcuvitz* and *Andrea H. Roschke.*

For the defendant-respondent there was a brief and oral argument by *Timothy R. Karaskiewicz,* principal assistant corporation counsel, with whom on the brief was *William J. Domina,* corporation counsel.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Gloria Pinczkowski, seeks review of a published court of appeals decision affirming two circuit court judgments relating to the condemnation of her property for purposes of an airport expansion project.[1] She asserts that

---

[1] *See Pinczkowski v. Milwaukee County,* 2004 WI App 171, 276 Wis. 2d 520, 687 N.W.2d 791 (affirming judgments of the circuit court for Milwaukee County, Michael D. Guolee, Judge). Case number 2003AP1732 involves a challenge to the compensation ultimately paid for the acquisition of Pinczkowski's property. That case resulted in a judgment against Pinczkowski because the jury found the just compensation due Pinczkowski was less than the County paid. Case number 2003AP2127 involves Pinczkowski's claim for a replacement housing pay-

the circuit court erred by excluding evidence of the sale price of two adjacent properties previously sold to Milwaukee County and evidence of a private party's letter of intent to purchase her property. Pinczkowski also contends that she was entitled to a replacement housing payment.

¶ 2. Relying on well-established precedent, we determine that the circuit court properly excluded evidence of the sale price of the adjacent properties because the sales were to a condemning authority in the process of obtaining property for a public project. Likewise, we determine there was no circuit court error in excluding evidence of the letter of intent because it was speculative evidence of fair market value, and we observe that Pinczkowski was otherwise able to put her theory of private party interest before the jury. Finally, adhering to principles of deference to agency interpretations of statutory and administrative code provisions, we uphold the state Department of Commerce determination that Pinczkowski was not entitled to a replacement housing payment. Accordingly, we affirm the decision of the court of appeals.

I

¶ 3. In 1987, the County began planning to expand General Mitchell International Airport. The County's plan was eventually detailed in an "Airport Master Plan," dated April 1992, and was approved by the Milwaukee County Board of Supervisors in 1993. The Plan reflected an intent to acquire private property,

including Pinczkowski's property and two adjacent properties, for uses related to expansion of the airport. In 1996, the County Board passed a resolution directing County officials to commence negotiations with the property owners.

¶ 4. Also by the mid-1990s, Hertz Corporation and another rental car company were informed that they would need to relocate their service facilities. Hertz contacted Pinczkowski and in July 1997 sent her a letter of intent to purchase her property for a specified amount. Hertz did not, however, ultimately purchase the property.

¶ 5. The County purchased the adjacent properties in 1997 and 1998. Then, in August 1999, it initiated negotiations to purchase Pinczkowski's property. It sent her a letter indicating an offer of $93,027 and explaining her eligibility for a replacement housing payment of $24,178.47, provided that she sold her house to the County for the offered amount.

¶ 6. After Pinczkowski rejected the County's $93,027 offer, the County acquired title to her property in November 2000 through eminent domain with an award of damages for $350,000. Pinczkowski challenged the amount of the award by bringing an action in circuit court, and the case was set for trial.

¶ 7. Prior to trial, the County brought a motion in limine to exclude certain evidence, and the circuit court made two key rulings that correspond to the issues now before us. First, the circuit court barred evidence of the price the County paid for its 1997 and 1998 purchases of the properties adjacent to Pinczkowski's property. The circuit court determined that the evidence was not admissible because the County purchased these properties in pursuit of the airport expansion project, with the right to acquire the property by eminent domain.

Therefore, the circuit court reasoned that the sales were not arms-length transactions and thus not indicative of fair market value. Second, the circuit court barred evidence of the Hertz letter of intent, determining that it was conditional, non-binding, and speculative.

¶ 8. At trial, during Pinczkowski's testimony, her counsel sought to introduce evidence of the Hertz letter, including the letter itself but with the amount of the offer redacted. Counsel asserted that, despite the court's previous ruling, evidence of the fact of the Hertz letter was admissible to show that there was private interest in Pinczkowski's property for a specific purpose. She also sought to rely on the letter to show that when the County bought the adjacent properties, it ruined Hertz's plan to assemble Pinczkowski's property with adjacent property. The circuit court ruled the evidence inadmissible.

¶ 9. The jury determined the fair market value of Pinczkowski's property was $300,000, or $50,000 less than the County had paid pursuant to its award of damages. It also found that $15,000 should be deducted from Pinczkowski's award because of environmental conditions on the property. Thus, the verdict resulted in a net award of $285,000.

¶ 10. Meanwhile, Pinczkowski had purchased a new residence for $155,000 and sought to claim a replacement housing payment. The County denied her claim. Pinczkowski petitioned the state Department of Commerce for review. The department agreed with the County's decision. It explained that "the County paid Gloria C. Pinczkowski $350,000 for her property appraised at $93,027. It is our opinion that the 'financial

means' standard, COMM 202.01(20), has been met for determining if a comparable dwelling is affordable for an owner-occupant."[2]

¶ 11. Pinczkowski then brought an action on the claim in circuit court that was consolidated with her award-of-damages case. After the jury trial in the award-of-damages case, the circuit court dismissed Pinczkowski's claim for the replacement housing payment on a County motion for summary judgment. The circuit court agreed with the County and department that Pinczkowski was not entitled to the payment.

¶ 12. Pinczkowski appealed both the judgment in the award-of-damages case and the judgment dismissing her claim for the replacement housing payment. She challenged the circuit court's determinations that the sale prices of the adjacent properties were inadmissible at trial, that evidence of the Hertz letter of intent was inadmissible, and that she was not entitled to a replacement housing payment.

¶ 13. The court of appeals affirmed the circuit court. It determined that clear precedent prohibits the introduction of the sale price of otherwise comparable properties when they are sold to a condemning authority engaged in negotiations to obtain property for a public project. The court of appeals agreed with the

---

[2] Wisconsin Admin. Code § Comm 202.01(20)(a) (March 1997) provides:

> (a) Owner-occupant. The acquisition price of the comparable replacement dwelling does not exceed the sum of the payment for the acquired dwelling and the comparable replacement housing payment available under this chapter.

All references to Wis. Admin. Code ch. Comm 202 are to the March 1997 register, the most recent version of this code chapter.

circuit court that the expired letter of intent submitted by Hertz was conditional and speculative. In addition, it determined that the exclusion of evidence of the letter was not prejudicial to Pinczkowski. The court of appeals also agreed with the department and circuit court that Pinczkowski was ineligible for a replacement housing payment.

## II

¶ 14. Broadly stated, this case presents three issues for our review. Two issues involve evidentiary rulings and the third issue focuses on the interpretation of statutory and administrative code provisions.

¶ 15. We will uphold a circuit court's evidentiary rulings if it examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach. *Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). Whether the circuit court applied the proper legal standards, however, presents a question of law subject to independent appellate review. *See City of Madison v. DWD,* 2003 WI 76, ¶ 10, 262 Wis. 2d 652, 664 N.W.2d 584. The interpretation of a statute or administrative code provision also presents a question of law, but may warrant deference when we review that question in the context of an agency decision. *See Board of Regents v. State Personnel Comm'n,* 2002 WI 79, ¶ 42, 254 Wis. 2d 148, 646 N.W.2d 759.

## III

¶ 16. We turn first to the issue of whether the circuit court erred in excluding evidence of the price for the 1997 and 1998 sales of the properties adjacent to

351

Pinczkowski's property. In order to resolve this issue, we begin with an examination of a long-standing evidentiary rule pertaining to the exclusion of purchase prices paid by condemning authorities as evidence of fair market value. Based on that rule, we determine that evidence of the sale price for the adjacent properties was not admissible to show the fair market value of Pinczkowski's property. We also determine that regardless of whether the rule leaves room for an exception advanced by Pinczkowski, the facts here do not fit within that exception. Because the circuit court's ruling barred Pinczkowski's appraisers from relying on the sales, we address whether such reliance is a permissible use of the evidence in light of the long-standing rule, and we conclude that it is not.

## A

¶ 17. This court recognized in *Blick v. Ozaukee County*, 180 Wis. 45, 46, 192 N.W. 380 (1923), that "the price paid in settlement of condemnation proceedings, or the price paid by the condemnor for similar land, even if proceedings had not been begun, where the purchaser has the power to take by eminent domain, is not admissible." This general rule of inadmissibility is firmly rooted in market principles and logic:

> What the party condemning has paid for other property is incompetent. Such sales are not a fair criterion of value, for the reason that they are in the nature of a compromise. They are affected by an element which does not enter into similar transactions made in the ordinary course of business. . . . The fear of one party or the other to take the risk of legal proceedings ordinarily results in the one party paying more or the other taking less than is considered to be the fair market value of the property. For these reasons such

352

> sales would not seem to be competent evidence of value in any case, whether in a proceeding by the same condemning party or otherwise.

*Blick,* 180 Wis. at 46–47 (quoting 2 Lewis, Em. Dom. § 667 (3d ed.)).

> If a sale is made to a condemnor that is about to institute proceedings if it cannot acquire the land by purchase at a satisfactory price, the amount paid is not a fair test of market value . . . .

*Kirkpatrick v. State,* 53 Wis. 2d 522, 526, 192 N.W.2d 856 (1972) (quoting what is now 4 *Nichols on Eminent Domain,* § 12B.07[2], at pp. 12B-44 to 12B-45 (3d ed. 2004)).

¶ 18. Thus, dealings between one who must buy and one who must sell are not probative of fair market value because such dealings do not, by definition, reflect fair market value. *See Kirkpatrick,* 53 Wis. 2d at 526. Fair market value is "the amount for which the property could be sold in the market on a sale by an owner willing, but not compelled, to sell, and to a purchaser willing and able, but not obliged, to buy." Wis. JI—Civil 8100; *accord Vivid, Inc. v. Fiedler,* 219 Wis. 2d 764, 787, 580 N.W.2d 644 (1998) ("Fair market value is what a willing buyer would pay to a willing seller, neither being under compulsion.").

¶ 19. "The problem with evidence of sales of other land to the condemning authority is that the price may very well not be the fair market value of land, no matter how comparable the land may be in its physical aspects." *Kirkpatrick,* 53 Wis. 2d at 526. Consequently, as a general matter, "[s]ales to condemning agencies are deemed to be incompetent evidence of market value

because of the threat of condemnation in lieu of voluntary purchase." 7A *Nichols on Eminent Domain,* § 9A.04[2][a], at p. 9A-39 (3d ed. 2004).

¶ 20. In addition, the general rule of inadmissibility is one of sound public policy and judicial economy. A different rule in condemnation proceedings would likely result in satellite litigation relating to the allegedly voluntary or involuntary nature of sales of other property. For each such sale, testimony by former property owners, their agents, the agents of the condemning authority, and other evidence would all be fair game as the basis for fact-intensive disputes in preliminary evidentiary proceedings.[3]

¶ 21. In *Kirkpatrick,* we reaffirmed the rule in *Blick. Kirkpatrick,* 53 Wis. 2d at 526. Subsequently, in *Herro v. DNR,* 67 Wis. 2d 407, 432, 227 N.W.2d 456 (1975), we again upheld this long-standing rule, noting that "[t]he rule in Wisconsin on this issue is settled," and represents "[t]he great weight of authority" across jurisdictions. *Herro,* 67 Wis. 2d at 432 (quoting *Blick,* 180 Wis. at 46, for the latter proposition); *see also* J. H. Cooper, Annotation, *Admissibility on Issue of Value of Real Property of Evidence of Sale Price of Other Real Property,* 85 A.L.R.2d 110, § 10 (1962 updated to June 2, 2005, by Later Case Service).

¶ 22. Pinczkowski nonetheless asserts that the adjacent property sales here should be admissible as voluntary, arms-length transactions. This argument

---

[3] At oral argument, counsel for Pinczkowski acknowledged as much: "If I could write the script of how this should be played out . . . [i]deally I would want this presented in a hearing associated with a motion in limine in which *all* of the information could be brought forward by either party on the degree of voluntariness or the opposite . . . ." (Emphasis in original remarks.)

misses the mark. As both the court of appeals and the circuit court recognized, her attempt to characterize these particular sales as voluntary is semantic and ultimately unconvincing. While the sales may have been voluntary in the sense that the County had not yet commenced formal condemnation procedures under Wis. Stat. § 32.05 (2003–04),[4] the sales were decidedly not voluntary in the sense relevant to the rationale of market-skewing behind the *Blick* line of cases.

¶ 23. The County's airport expansion plans dated back to 1987. At the time, there were numerous conferences and public workshops, and the County's plan was eventually detailed in its Airport Master Plan in April 1992. The Plan reflected an intent to acquire Pinczkowski's property and the two adjacent properties for uses related to airport expansion, and the Plan was approved by the County Board in 1993. In 1996, a consultant retained by the County continued to recommend acquisition of these properties for purposes of airport expansion. The County Board promptly resolved to adopt that recommendation and directed County officials to commence negotiations with the property owners.

¶ 24. Thus, the County's intent to acquire the adjacent properties for airport expansion purposes would have been well known by at least 1996. Indeed, Pinczkowski's attorney, in closing arguments to the jury, recognized as much:

> By the early 1990s . . . [t]he county, in clear recognition of what is needed to grow the airport, developed and then approved a plan which made it clear to everyone that the destiny of the Pinczkowski property

---

[4] All references to the Wisconsin Statutes are to the 2003–04 version.

and its neighbors was to become part of General Mitchell International Airport.

The County's widely-known intentions would have skewed the market for the targeted properties, including the properties adjacent to Pinczkowski's, precisely the concern underlying the *Blick* rule.

¶ 25. Given the circumstances here, we have little trouble determining, as did the circuit court and court of appeals, that the sales of the adjacent properties could not have been "voluntary" for purposes of the admissibility of their sale prices. The County, a condemning authority, was in the process of obtaining land for purposes of airport expansion at the time it purchased the properties. Accordingly, under the *Blick* rule and rationale, evidence of the sale price for those properties was not admissible to show the fair market value of Pinczkowski's property.

¶ 26. Based on the facts already recited, we also reject Pinczkowski's argument that the *Blick* rule should not apply because the sales of the adjacent properties were not part of an ongoing project. Pinczkowski asserts there was no ongoing project because the County had not issued a relocation order under § 32.05(1) for the adjacent properties.

¶ 27. Section 32.05(1) reads, in pertinent part:

> (1) RELOCATION ORDER. (a) Except as provided under par. (b), a county board of supervisors . . . shall make an order providing for the laying out, relocation and improvement of [an] . . . airport . . . which shall be known as the relocation order.

Thus, as a general matter, before the County can actually condemn property under § 32.05, it must issue

a relocation order. *See Wisconsin Town House Builders, Inc. v. City of Madison,* 37 Wis. 2d 44, 52, 154 N.W.2d 232 (1967).

¶ 28. Nothing about § 32.05(1) or the rationale behind the *Blick* evidentiary rule, however, convinces us that compliance with § 32.05(1) is necessary to trigger the applicability of the *Blick* rule. The *Blick* rule may render evidence of sales to a condemning authority inadmissible even though the authority has not yet initiated formal condemnation procedures.

¶ 29. Here, the County's public expression of its intent to acquire the properties adjacent to Pinczkowski's property as part of its airport expansion plans, and its resolution directing officials to commence negotiations to acquire these properties, suffice to warrant inadmissibility under the *Blick* line of cases. The properties were purchased by a condemning authority in the process of obtaining land for a public project and were therefore purchased under threat of condemnation within the meaning of *Blick.* Accordingly, the circuit court properly exercised its discretion in determining that evidence of the sale price for the adjacent properties was inadmissible.

B

¶ 30. We turn next to Pinczkowski's argument that this court should enunciate an exception to the rule set forth in the *Blick* line of cases, or what she terms a "new rule for voluntary transactions." In support of this argument, Pinczkowski relies on a number of authorities which, she asserts, embody this exception or "new rule."

357

¶ 31. For example, Pinczkowski cites *Cain v. City of Topeka,* 603 P.2d 1031 (Kan. Ct. App. 1979). In that case, the Kansas Court of Appeals stated that:

> the mere fact that the purchaser of land was invested with the power of eminent domain does not in and of itself indicate that the sale was anything other than a fair, arm's length transaction . . . . If the evidence is such as to indicate that an arm's length transaction occurred, then the rule [prohibiting admission] does not apply.

*Cain,* 603 P.2d at 1034 (citations omitted).[5]

¶ 32. In addition, Pinczkowski refers us to this statement in a leading treatise: "[T]he mere fact that a corporation, which purchased land by voluntary sale, was invested with the power of eminent domain does not in and of itself show that the sale was a compulsory settlement rather than a fair transaction in the market." 5 *Nichols on Eminent Domain,* § 21.02[6], at pp. 21–75 to 21–76 (footnote omitted); *see also* 5 *Nichols on Eminent Domain,* § 21.02[6], at p. 21–77 ("In general, the price [paid] by an entity having eminent domain power but not using that authority to acquire the property may be introduced to establish fair market value so long as the transaction was not influenced by any fear of litigation.").

¶ 33. We need not decide whether the *Blick* line of cases leaves room for the exception articulated by these authorities and characterized by Pinczkowski as a "new

---

[5] Pinczkowski cites other authorities for similar rules. *See Transwestern Pipeline Co. v. O'Brien,* 418 F.2d 15, 19 (5th Cir. 1969); *Slattery Co. v. United States,* 231 F.2d 37, 41 (5th Cir. 1956); *Amory v. Commonwealth,* 72 N.E.2d 549, 559 (Mass. 1947).

rule" that this court should adopt. Even if it did, the facts here would not fall within such an exception.

¶ 34. The central tenet of the cited authorities is that the fact that a purchaser possesses the power to condemn does not by itself prove that the price of the sale should be inadmissible as incompetent evidence of fair market value. Here, however, we are confronted with much more than the fact that the County possessed the power of eminent domain at the time it purchased the adjacent properties.

¶ 35. As already explained, we are confronted with a case in which the County, through County Board action and other means, had publicly declared its intent to acquire the properties and in which the County Board had by resolution specifically directed County officials to commence negotiations for the acquisition of those properties. As such, they would not fit the exception or "new rule" as proposed by Pinczkowski.

C

¶ 36. The circuit court's ruling also prevented Pinczkowski's appraisers from relying on the sale price of the adjacent properties in forming their estimates of the value of Pinczkowski's property. We therefore address whether such reliance may be permissible despite the rule of inadmissibility under *Blick*.

¶ 37. In the condemnation context, "[t]he general rule regarding admission of comparable sales as direct evidence of value is more restrictive than the admissibility rule when the evidence is offered only to show a basis for the opinion of an expert witness." *Kamrowski v. State,* 37 Wis. 2d 195, 202, 155 N.W.2d 125 (1967). At

the same time, however, "[s]ome evidence as to alleged comparable sales when offered even for this more limited purpose [of basis of opinion on value] may confuse or mislead the jury" and should therefore be excluded. *Id.* at 203; *see also Calaway v. Brown County,* 202 Wis. 2d 736, 741–42, 745, 553 N.W.2d 809 (Ct. App. 1996).

¶ 38. The general evidentiary rule pertaining to the basis for expert testimony is also relevant here. Under that rule, although an expert may rely on facts or data that are not themselves admissible, those facts or data must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences. Wis. Stat. § 907.03[6]; *Enea v. Linn,* 2002 WI App 185, ¶ 16, 256 Wis. 2d 714, 650 N.W.2d 315.

¶ 39. We determine that, given the rationale behind the *Blick* line of cases, it makes no difference whether Pinczkowski sought to offer evidence of the sale price for the adjacent properties directly or whether she sought to have her appraisers rely on those prices as a basis for their estimates of value. The adjacent property sales were inherently unreliable indicators of market value and, in that sense, not comparable sales. Allowing evidence of the properties' sale prices would have been practically certain to confuse or mislead the jury. *See Kamrowski,* 37 Wis. 2d at 203; *Calaway,* 202 Wis. 2d at 741–42. Likewise, because of their inherent unreliability as an indicator of market

---

[6] Wisconsin Stat. § 907.03 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

value, such sales cannot constitute facts or data of a type reasonably relied upon by experts in the field in forming opinions or inferences. *See* § 907.03; *Enea,* 256 Wis. 2d 714, ¶ 16.

¶ 40. In sum, under the rule and rationale articulated in the *Blick* line of cases, evidence of the sale price for the adjacent properties was not admissible to show the fair market value of Pinczkowski's property, and Pinczkowski's appraisers could not rely on the sales of those properties. The circuit court therefore properly exercised its discretion in excluding evidence of the sale price for the adjacent properties.

## IV

¶ 41. We next address the circuit court's evidentiary rulings barring evidence of Hertz's letter of intent, which reflected Hertz's interest in Pinczkowski's property. Prior to trial, Pinczkowski maintained that the amount of Hertz's offer should have been admitted. Pinczkowski has now accepted the circuit court's ruling that the amount was inadmissible but continues to contend, as she did during trial, that evidence of the fact of the offer, without the amount of the offer, should have been admitted.

¶ 42. Both the court of appeals and circuit court correctly recognized that "[t]he general rule in condemnation cases is . . . that offers to purchase property are not receivable as evidence of its market value." *Fox Wisconsin Theatres, Inc. v. City of Waukesha,* 253 Wis. 452, 456, 34 N.W.2d 783 (1948); *see also* 7A *Nichols on Eminent Domain,* § 9A.04[2][b], at p. 9A-41 ("Generally, unaccepted offers to purchase are not admissible to show fair market value.").

361

¶ 43. In certain situations, offers may nonetheless be admissible as evidence of fair market value "when made with actual intent and pursuant to actual effort to purchase." *Fox,* 253 Wis. at 456 (quoting *Sammond v. Tax Commission,* 230 Wis. 23, 40, 283 N.W. 452 (1939)). "In order to qualify as probative evidence, there must be a preliminary foundation of '[t]he *bona fides* of the offer, the financial responsibility of the offeror, and [the offeror's] qualifications to know the value of the property.' " *Bihlmire v. Hahn,* 31 Wis. 2d 537, 544–45, 143 N.W.2d 433 (1966) (quoting *Fox,* 253 Wis. at 458).

¶ 44. Hertz's letter of intent was speculative evidence of fair market value in light of its preliminary and conditional nature. This is apparent from the face of the letter. First, Pinczkowski failed to sign the letter before its expiration date. Second, the letter indicated that even if signed by Pinczkowski, it was non-binding. Third, the letter set forth contingencies, including inspection for environmental conditions and "all other necessary government approvals." It also contained numerous strike-outs, leaving unclear whether Hertz and Pinczkowski had a meeting of the minds, even as to this non-binding agreement. The circuit court aptly characterized the letter as speculative and "one step removed from an offer."

¶ 45. Pinczkowski nonetheless argues that the fact of Hertz's letter of intent, without reference to the amount of Hertz's offer, was admissible to show that there was a private market for her property for a particular use. She also contends it was relevant to show that when the County bought the adjacent properties, it ruined Hertz's plan to assemble Pinczkowski's property with adjacent property. In the same vein, she

asserts that the letter would also have validated her appraisers' assemblage approach to valuation.

¶ 46. We recognize that the existence of a letter of intent from a third party may be relevant generally to show private interest in property for a particular use, whether standing alone or assembled in combination with another property. However, we are not persuaded by Pinczkowski's arguments that the circuit court erred in barring evidence of the letter.

¶ 47. Insofar as Pinczkowski was seeking to admit the evidence to establish a particular fair market value based on the existence of Hertz's letter of intent, the evidence was inadmissible under the rule articulated in *Fox*. While the threshold between offers that are admissible and those that are not may not always be clear under the principles of *Fox*, in this case it is plain that Hertz's letter of intent falls on the inadmissible side of the threshold. Moreover, the circuit court has broad discretion in making evidentiary rulings, and our inquiry into whether the court properly exercised that discretion is highly deferential. *Martindale v. Ripp*, 2001 WI 113, 246 Wis. 2d 67, 629 N.W.2d 698, ¶¶ 28–29.

¶ 48. To the extent that Pinczkowski was instead seeking to admit evidence of the Hertz letter to establish more generally her theory that there was a private interest in her property for a particular use, whether standing alone or assembled with other properties, she was able to put that theory fully to the jury without evidence of the letter. Even assuming arguendo that there was error, the trial record amply demonstrates that Pinczkowski would not have been prejudiced because she was otherwise able to put her theory of private party interest before the jury.

¶ 49. During opening statements, Pinczkowski's counsel told the jury, without objection by the County, that it would learn that Hertz had an interest in acquiring Pinczkowski's property. Under adverse examination, the airport director testified that Hertz and another rental car company were informed that they would need to relocate their service facilities.[7]

¶ 50. At least one of Pinczkowski's appraisers testified that the zoning of her property would have permitted it to be used as a car rental facility. Similarly, the County appraiser testified that a rental car service facility would have been a potential use for Pinczkowski's property. Under cross-examination, the County's expert also acknowledged that Pinczkowski's property could have been combined with one of the adjacent properties to form a lot similar in size to the site that Hertz ultimately purchased.

¶ 51. Both of Pinczkowski's appraisers testified that they used the property that Hertz purchased as a comparable sale. They also testified that their estimates were based on assemblage theories of value.

¶ 52. During closing arguments, Pinczkowski's attorney reminded the jury that Hertz had been informed it would have to relocate. Counsel emphasized, again without objection by the County, that Hertz would have been a potential buyer for Pinczkowski's property and that Hertz may have been interested in combining properties. Finally, counsel underscored for

---

[7] The airport director also testified specifically as to Hertz's interest in Pinczkowski's property, but the County immediately objected, and the circuit court instructed the jury to disregard this testimony. Similarly, when Pinczkowski testified that Hertz had contacted her, the court told the jury to disregard the testimony after the County objected.

the jury that "[e]ven [the County's appraiser] admitted that Hertz could have gotten exactly what it needed by simply combining the Pinczkowski property with the neighbor to the north." Thus, the jury became well acquainted with the theory that there was private interest in her property for a particular use, whether standing alone or assembled with other properties.

¶ 53. In sum, there was no error in the circuit court's exclusion of evidence of the Hertz letter. The letter was speculative evidence of fair market value. Even assuming arguendo that there was error, Pinczkowski was not prejudiced because she was otherwise able to put her theory relating to private party interest in her property before the jury.[8]

V

¶ 54. Finally, we must address the determination by the County, the department, the circuit court, and the court of appeals that Pinczkowski was not entitled to a replacement housing payment. Pinczkowski asserts that she was entitled to the replacement housing payment under Wis. Stat. § 32.19(4)(a).
¶ 55. Section 32.19 provides:

---

[8] Pinczkowski also argues that evidence of Hertz's letter of intent would have validated her experts' approach to choice of comparables. According to Pinczkowski, the letter helps show why her appraisers relied on Hertz's eventual purchase of another property and would have lent more credence to her appraisers' estimates of value. The court of appeals declined to address this argument because Pinczkowski did not raise it in the circuit court. We agree with the court of appeals that this argument should be deemed waived. *See Wirth v. Ehly,* 93 Wis. 2d 433, 443, 287 N.W.2d 140 (1980).

365

(4) Replacement housing. (a) Owner-occupants. In addition to amounts otherwise authorized by this subchapter, the condemnor shall make a payment, not to exceed $25,000, to any displaced person who is displaced from a dwelling actually owned and occupied . . . by the displaced person for not less than 180 days prior to the initiation of negotiations for the acquisition of the property. . . . Such payment includes only the following:

1. The amount, if any, which when added to the acquisition payment, equals the reasonable cost of a comparable replacement dwelling available on the private market, as determined by the condemnor.[9]

¶ 56. The County's August 1999 letter to Pinczkowski informed her that it was the County's "initiation of negotiations" for the purchase of her property and that the County was offering $93,027 as just compensation for her property. It also informed her that the cost of a comparable replacement dwelling was determined to be $77,926.47 and that the replacement housing payment was calculated to be $24,178.47.

¶ 57. Ordinarily, under Wis. Admin. Code. § Comm 202.68, a replacement housing payment to a person displaced from a dwelling is "the selling price of a comparable dwelling on a lot typical for the area, less the price of the acquired dwelling and the site." However, because Pinczkowski's property consisted of a lot that was larger than average in size and that had a higher and better use, the County calculated a "carve-out" for her property pursuant to § Comm 202.68(7)(a)2. and (7)(c).[10]

---

[9] The payment may include amounts for other items, which we have not enumerated here. *See generally* Wis. Stat. § 32.19(4)(a). As we understand the parties' arguments, such other items are not at issue in this case.

[10] Wisconsin Admin. Code § Comm 202.68(7), provides:

¶ 58. The County thus separated out from the total offered amount of $93,027 an amount attributable to the residence plus the portion of Pinczkowski's land that represented a lot typical for the area. *See* § Comm 202.68(7)(a)2. and (7)(c). It calculated this amount to be $53,748. By then subtracting the $53,748 figure from the $77,926.47 cost of a comparable replacement dwelling, the County arrived at the $24,178.47 replacement housing payment.

¶ 59. Pinczkowski rejected the County's $93,027 offer and submitted an application for the replacement housing payment. Shortly after the date of Pinczkowski's application, the County made the $350,000 award of damages. It then denied her application for the replacement housing payment.

¶ 60. Pinczkowski petitioned the department for review of the County's denial of her claim. After the department issued a decision agreeing with the County's denial of the claim, Pinczkowski brought an action on the claim in circuit court. The circuit court

(7) Carve-out and modification of replacement payment computation. (a) Complete acquisition. . . .

2. Larger than typical size lot. The maximum replacement payment shall be the price of a comparable dwelling on a lot typical for the area, less the price of the acquired dwelling plus the price of that portion of the acquired land which represents a lot typical for the area, when the acquired dwelling is located on a lot size larger than typical for the area.

. . . .

(c) Dwelling on land with higher and better use. The maximum replacement payment shall be the selling price of a comparable dwelling on a lot typical in the area, less the price of the acquired dwelling, and the price of that portion which represents a lot typical for residential use in the area, when the market value is based on a higher and better use than residential.

dismissed the claim on summary judgment, and the court of appeals affirmed.

¶ 61. Recognizing that the circuit court decided her claim on summary judgment, Pinczkowski cites the standard of review for summary judgment in her brief, but she is otherwise silent on the matter of whose decision we should be reviewing and under what standard we should be reviewing it. The County, although not advancing a particular standard of review, has repeatedly emphasized in its brief and at oral argument that the department affirmed its decision that Pinczkowski was not entitled to a replacement housing payment.

¶ 62. For reasons explained further below, we determine that, under the circumstances of this case, we will review the decision of the department. Such review implicates one of three levels of deference: great weight, due weight, or no weight. *Board of Regents,* 254 Wis. 2d 158, ¶ 42.

■

¶ 63. Great weight deference applies when (1) the agency is charged by the legislature with the duty of administering a statute; (2) the interpretation of the agency is one of long-standing; (3) the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute. *UFE Inc. v. LIRC,* 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996).

■

¶ 64. Due weight deference review, in turn, is not so much based upon an agency's knowledge or skill as it is on the fact that the legislature has charged the agency with the enforcement of the statute in question. *Id.* at 286.

¶ 65. We give no deference to an agency decision if the issue before the agency is clearly one of first impression, if a legal question is presented and there is no evidence of any special agency expertise or experience, or if the agency's position on an issue has been so inconsistent that it provides no real guidance. *Coutts v. Wisconsin Ret. Bd.*, 209 Wis. 2d 655, 664, 562 N.W.2d 917 (1997).

¶ 66. The legislature, in Wis. Stat. § 32.26, has addressed the role and authority of the department in matters relating to eminent domain. It has specifically charged the department with a number of responsibilities relating to § 32.19, the relocation payment statute that is the source of Pinczkowski's claim. These responsibilities include that the department shall promulgate rules to implement and administer § 32.19; may make investigations to determine whether a condemnor is complying with § 32.19 and may seek a court order requiring compliance; shall prepare pamphlets for condemnees, in cooperation with the attorney general; and shall provide technical assistance on relocation plan development. *See* § 32.26.

¶ 67. Under Wis. Admin. Code § Comm 202.18, promulgated pursuant to the department's legislatively granted authority, *see* Wis. Admin. Code § Comm 202.001, a claimant may file a "relocation appeal" with the department, which may proceed on such an appeal in a number of ways.[11] Similarly, § 32.26(5) provides that a person claiming a replacement housing payment

---

[11] Wisconsin Admin. Code § Comm 202.18 reads as follows:

Relocation appeal. A displaced person, or one claiming to be displaced, may file a complaint for review by the department under this subsection.

may petition the department for review.[12] The claimant
may also seek initial review of the condemning

. . . .

(2) Appeal to displacing agency. An agency shall establish an
internal appeal procedure to resolve a relocation complaint. . . .

(3) Appeal to department. A displaced person may file an
appeal to the department. The department shall:

(a) Receive and consider all relocation complaints filed under
this chapter;

(b) Provide a written notice to the displacing agency within
five working days of receipt of a complaint, including a copy of the
complaint;

(c) Request that an agency or a displaced person provide
materials or documentation pertinent to a complaint and shall
specify a time to provide the materials;

(d) Promptly notify the parties of a dispute when the depart-
ment determines that a complaint is unreasonable, including the
reasons;

(e) Schedule an informal meeting with the parties when
necessary to resolve a dispute. The meeting shall be scheduled as
soon as practicable and be held in the county where displacement
occurred or another mutually agreed location;

(f) Provide a written determination when necessary to resolve
a dispute;

(g) Notify the parties within 90 days after an informal
meeting when an acceptable solution cannot be negotiated.

[12] Wisconsin Stat. § 32.26(5) reads:

Any displaced person may, prior to commencing court action
against the condemnor under s. 32.20, petition the department of
commerce for review of his or her complaint, setting forth in the
petition the reasons for his or her dissatisfaction. The department
may conduct an informal review of the situation and attempt to
negotiate an acceptable solution. If an acceptable solution cannot
be negotiated within 90 days, the department shall notify all
parties, and the petitioner may then proceed under s. 32.20. The
informal review procedure provided by this subsection is not a

370

authority's denial of a claim directly in circuit court under § 32.26(5) and Wis. Stat. § 32.20.[13]

¶ 68. Here, Pinczkowski chose to seek initial review with the department. Specifically, after the County denied Pinczkowski's claim, Pinczkowski filed a "Petition and Appeal for Denial of Relocation Claim for Replacement Housing Payment" with the department "pursuant to § 32.26(5) and Wis. Admin. Code § Comm 202.18." The County submitted a letter brief in response to the petition, Pinczkowski submitted her own brief in response to the County's, and the County subsequently submitted a reply brief. After the briefing, the department issued a written determination under § Comm 202.18(3).

¶ 69. Given the legislature's charge to the department, the statutory and administrative scheme for seeking review, the technical nature of the carve-out provisions, and the particular circumstances of this case, we determine that we will review the department's determination, and that we will give that determination

condition precedent to the filing of a claim and commencement of legal action pursuant to s. 32.20. . . .

[13] Wisconsin Stat. § 32.20 reads:

Claims for damages itemized in ss. 32.19 and 32.195 shall be filed with the condemnor carrying on the project through which condemnee's or claimant's claims arise. All such claims must be filed after the damages upon which they are based have fully materialized but not later than 2 years after the condemnor takes physical possession of the entire property acquired or such other event as determined by the department of commerce by rule. If such claim is not allowed within 90 days after the filing thereof, the claimant has a right of action against the condemnor carrying on the project through which the claim arises. Such action shall be commenced in a court of record in the county wherein the damages occurred. . . .

deference. We need not decide whether to give great weight deference or due weight deference to the department's determination because we conclude that its determination was reasonable and that Pinczkowski's interpretation of the relevant statutory and administrative code provisions is no more reasonable. Applying even due weight deference, a reviewing court will not overturn a reasonable agency interpretation unless the court determines that there is a more reasonable interpretation. *UFE Inc.,* 201 Wis. 2d at 287.

■

¶ 70. In the department's written decision, it cited Wis. Admin. Code § Comm 202.01(20) and concluded that Pinczkowski was not entitled to a replacement housing payment because "[t]he sum of the acquisition price and the replacement housing payment for the acquired dwelling exceeds the acquisition price of the replacement dwelling." Section Comm 202.01(20), in turn, reflects the applicable standard in § 32.19(4)(a)1., which provides that the replacement housing payment consists of "[t]he amount, *if any,* which when added to the acquisition payment, equals the reasonable cost of a comparable replacement dwelling . . . ." (Emphasis added.)[14] Obviously, the acquisition price (or payment) for Pinczkowski's property, whether taken to be the $350,000 in her award of damages or the $285,000 as found by the jury, far outstrips both the undisputed $77,926.47 cost of a comparable replacement dwelling and the $155,000 cost of the replacement home she actually purchased.

¶ 71. It is not readily apparent from the face of the carve-out provisions in the administrative code

---

[14] Again, as previously noted, the payment may include amounts for other items not at issue here.

whether or how the initially proffered $24,178.47 replacement housing payment should have been recalculated in light of the $350,000 award of damages that Pinczkowski received or the $285,000 the jury awarded. Additionally, we note that the record does not reflect what portion of the $285,000 the jury attributed to "the acquired dwelling" or to "that portion of the acquired land which represents a lot typical for the area." Section Comm 202.68(7)(a)2.; *see also* § Comm 202.68(7)(c).

¶ 72. What is apparent, however, is that any calculation based on the carve-out provisions must be guided by the statutory standard defining the type of replacement housing payment Pinczkowski seeks. It is "[t]he amount, *if any,* which when added to the acquisition payment, equals the reasonable cost of a comparable replacement dwelling . . . ." Section 32.19(4)(a)1. (emphasis added). This is the standard the department applied, and when we examine that standard in light of the facts presented here, we cannot say that the department's application of the standard was unreasonable.

¶ 73. Pinczkowski asserts that there is no basis for changing the initial carve-out value or for recalculating the original amount of the replacement housing payment associated with the County's $93,027 offer in its August 1999 letter. We disagree.

¶ 74. First, the letter makes the $24,178.47 replacement housing payment contingent upon the acceptance of the $93,027 offer. It states, in relevant part:

A. Replacement Housing Payment

This payment has been determined to be $24,178.47, based on a comparable housing study of houses presently for sale on the real estate market, *provided you sell your house to Milwaukee County for the above stated appraisal amount,* which included a

373

carve-out amount of $53,748.00, and you purchase a replacement dwelling which costs at least $77,926.47.

(Emphasis added.) Pinczkowski's assertion that the County is forever bound by the initial offer of a replacement housing payment is undermined by the clear language of the letter.

¶ 75. Second, both statutory and administrative code provisions contemplate that the initial offer of a replacement housing payment is not static in amount. Rather, these provisions contemplate a more dynamic approach, allowing for re-computation of the payment after the acquisition damages have been more fully assessed.[15]

¶ 76. Under § 32.20, all claims for damages itemized in § 32.19 are ordinarily to be filed "*after the damages upon which they are based have fully materialized* but no later than 2 years after the condemnor takes physical possession . . . ." (Emphasis added.) Additionally, § Comm 202.68(6) provides as follows:

> (6) Advance payment in a condemnation case. An agency shall promptly pay a replacement housing payment. An advance payment shall be made when an agency determines the acquisition payment will be delayed because of condemnation proceedings. An agency's *maximum offer shall be used as the acquisition price for calculating the payment.* The payment shall be contingent on a person signing an affidavit of intent that:

---

[15] Pinczkowski also asserts that the County was equitably estopped from denying her replacement housing claim. We agree with the court of appeals, however, that Pinczkowski has not met the elements of equitable estoppel. For the reasons stated above, she could not have reasonably relied on the County's August 1999 letter as guaranteeing a fixed housing payment.

(a) The agency shall *re-compute a replacement payment using the acquisition amount set by the court* . . . .

(Emphasis added.)

¶ 77. Given all the circumstances here, and given that Pinczkowski has not adequately explained how the facts of record support her interpretation of the carve-out formulas to yield a fixed replacement housing payment that could not change after the County's initial offer and calculation, we determine that Pinczkowski's application of the relevant statutory and administrative code provisions is no more reasonable than that of the department. We therefore uphold the department's determination that Pinczkowski was not entitled to a replacement housing payment.

## VI

¶ 78. In sum, we determine that the circuit court properly excluded evidence of the sale price of the adjacent properties because the sales were to a condemning authority in the process of obtaining property for a public project. In addition, we determine there was no circuit court error in excluding evidence of the letter of intent because it was speculative evidence of fair market value, and we observe that Pinczkowski was otherwise able to put her theory of private party interest before the jury. Finally, we uphold the department's determination that Pinczkowski was not entitled to a replacement housing payment. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.