# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP2627 |
| COMPLETE TITLE: | Mark McNally, |
| |       Plaintiff-Respondent, |
| |   v. |
| | Capital Cartage, Inc. d/b/a Capital Cartage Moving & Storage, |
| |       Defendant-Appellant-Petitioner, |
| | Mary R. Hermanson, |
| |       Defendant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 375 Wis. 2d 798, 899 N.W.2d 738
(2017 – unpublished)

| | |
|---|---|
| OPINION FILED: | May 10, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 17, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dane |
|   JUDGE: | Juan B. Colas |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | ZIEGLER, J., dissents (opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Nicole S. Schram*, *Cathleen A. Dettmann*, *Kevin J. Palmersheim*, and *Haley Palmersheim*, *S.C.*, Middleton. There was an oral argument by *Cathleen A. Dettmann.*

For the plaintiff-respondent, there was a brief filed by *Robert C. Procter*, *III*, with whom on the brief were *Justin H. Lessner*, and *Axley Brynelson*, *LLP*, Madison. There was an oral argument by *Robert C. Procter*, *III.*

An amicus curiae brief was filed on behalf of Wisconsin Realtors Association by *Debra P. Conrad* and *Wisconsin Realtors Association*, Madison.

2

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP2627
(L.C. No. 2014CV1624)

STATE OF WISCONSIN           :        IN SUPREME COURT

**Mark McNally,**

       **Plaintiff-Respondent,**

   **v.**

**Capital Cartage, Inc. d/b/a Capital Cartage Moving & Storage,**

       **Defendant-Appellant-Petitioner,**

**Mary R. Hermanson,**

       **Defendant.**

**FILED**

**May 10, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 ANN WALSH BRADLEY, J. The petitioner, Capital Cartage, Inc. (Capital Cartage), seeks review of an unpublished decision of the court of appeals affirming the circuit court's determination that real estate broker Mark McNally (McNally) is entitled to a commission pursuant to the listing contract between the parties.[1] Contrary to the court of appeals'

---

[1] McNally v. Capital Cartage, Inc., No. 2015AP2627, unpublished slip op., (Wis. Ct. App. Apr. 27, 2017) (affirming order of circuit court for Dane County, Juan B. Colas, Judge).

determination, Capital Cartage asserts that McNally is not entitled to a commission because the offer to purchase McNally procured contains substantial variances from the seller's terms as set forth in the listing contract.

¶2 Specifically, Capital Cartage argues that three terms in the offer to purchase constitute substantial variances from the listing contract. Among these is a dispositive condition that Mary Hermanson, one of Capital Cartage's owners, continue to work for the business without pay for an undetermined period of time following the sale.

¶3 Capital Cartage further asserts that the court of appeals erroneously interpreted Libowitz v. Lake Nursing Home, Inc., 35 Wis. 2d 74, 150 N.W.2d 439 (1967). It alleges that Libowitz did not, as the court of appeals concluded, alter the standard for determining whether a substantial variance exists as set forth by Kleven v. Cities Serv. Oil Co., 22 Wis. 2d 437, 126 N.W.2d 64 (1964).[2] Therefore, it contends that McNally is

---

[2] In Kleven, we concluded that "where the variance is a substantial one, such as one that is directly in conflict with a material provision of the listing contract, there has been no substantial performance by the broker which would entitle him to his commission, absent acceptance of the offer by the owner." Kleven v. Cities Serv. Oil Co., 22 Wis. 2d 437, 444, 126 N.W.2d 64 (1964) (emphasis added).

(continued)

2

not entitled to a commission because he did not procure an offer to purchase "at the price and on substantially the terms set forth" in the listing contract.

¶4   We conclude first that Kleven remains the law of this state with regard to determining whether a substantial variance exists between a listing contract and an offer to purchase. Although a term of the offer to purchase that is directly in conflict with the listing contract is a substantial variance, it is not the sole manner in which substantial variance may be shown.  Kleven offered direct contradiction as an example, not as a limitation.

¶5   Applying this standard, we conclude that in the context of the sale of a business with real estate where the sale did not go through, the condition in the offer to purchase that Mary Hermanson continue to work for Capital Cartage without pay constitutes a substantial variance from the listing contract as a matter of law.  Consequently, we determine that McNally did not procure an offer to purchase "at the price and on substantially the terms set forth" in the listing contract and therefore is not entitled to a commission.

---

In Libowitz, we stated that "the complaint would be demurrable on the ground of failing to state a cause of action if, in spite of liberal construction principles, it alleged variations between the terms of the listing contract and the offer that were:  [] Substantial variations, i.e., 'directly in conflict with a material provision of the listing contract' . . . "  Libowitz v. Lake Nursing Home, Inc., 35 Wis. 2d 74, 82, 150 N.W.2d 439 (1967) (emphasis added).

3

¶6 Accordingly, we reverse the court of appeals.

I

¶7 Mary and Rolyn Hermanson own Capital Cartage, a moving and storage business. Seeking to retire and sell the business with real estate, Mary Hermanson (Hermanson) met with McNally, a real estate broker. As a result of this meeting, McNally drafted a listing contract. He used the standard state form listing contract, labeled as a WB-6 Business Listing Contract.

¶8 The listing contract contained a provision setting forth the requirements that must be met for the broker to earn a commission. In relevant part, the contract provides:

> Seller shall pay Broker's commission, which shall be earned if, during the term of this Listing . . .[a]n offer to purchase is procured for the Business or included property by the Broker, by Seller, or by any other person, at the price and on substantially the terms set forth in this Listing and the standard provisions of the current [state form offer to purchase.]

¶9 The asking price for the business with real estate as reflected in the listing contract was $1.2 million.[3] Approximately three weeks after the listing contract was executed, McNally procured an offer to purchase Capital Cartage from Steven Erickson (Erickson).

¶10 Prior to submitting an offer to purchase, Erickson presented a letter of intent to Hermanson. The letter of intent

---

[3] Before the circuit court, Capital Cartage argued that the parties modified price in the listing contract from $1.2 million to $1.395 million. The jury rejected this argument, and Capital Cartage does not raise it before this court.

included, among others, the following three conditions for the sale:

> Lender required good faith deposit (approximately $7,500 for appraisal and other costs) is split between seller and buyer once financing is fully approved, commitment letter issued and appraisal ordered. Seller to be reimbursed in full for good faith deposit at closing.

> Covenant agreements not to compete signed by Mary and Rolyn Hermanson (prior to close)[.]

> Mary and Rolyn Hermanson agree to operate business as normal until acquisition takes place and for Mary to stay on full time and without pay for period outlined in proposed structure.[4]

¶11 Hermanson, dissatisfied with the letter of intent, sent an email to McNally objecting to the $1.2 million sale price. Instead, Hermanson sought a $1.4 million sale price.

¶12 As the letter of intent foreshadowed, Erickson's offer to purchase was for a price of $1.2 million. The offer to purchase was presented on the standard state form "WB-16 Offer to Purchase – Business with Real Estate." Erickson, however, included an additional page, labeled as "Addendum A," which consisted of the last page of the letter of intent. Addendum A listed conditions for the sale, which included the three above conditions at issue here.

---

[4] The "proposed structure" appears to be a reference to the first page of the letter of intent, which stated: "Seller stays on fulltime for period of 3 months to ensure proper transition. Operates on part time basis at seller discretion for rest of 2014. Part time hourly rate after year 2014 to be negotiated."

¶13 After receiving the offer, Mary and Rolyn Hermanson rejected the offer in a letter from their counsel to McNally. The letter stated in part:

> Capital Cartage, Inc., has just concluded its Special Meeting of Shareholders at my office this afternoon. The Wisconsin statutes require that a majority vote of the shareholders is necessary to sell the business. The vote was called and the motion to approve the offer to purchase failed to achieve a majority of the shareholders' votes. Capital Cartage has decided not to sell its business at this time.

Hermanson did not provide any other reason for rejecting the offer.

¶14 Subsequently, McNally filed this lawsuit, alleging that Capital Cartage owed him a commission of $72,000 pursuant to the listing contract. He asserted that he had procured an offer "at the price and on substantially the terms set forth in this Listing[.]"

¶15 Capital Cartage answered the complaint and subsequently moved for judgment on the pleadings. It argued that no commission was due as a matter of law because there were substantial variances between the listing contract and the offer Erickson submitted. Capital Cartage cited six alleged variances, including the three conditions at issue.[5]

---

[5] Capital Cartage also raised as alleged substantial variances the following:

> Line 45 of Offer states:  '. . . expenses incurred by Buyer in normal course of action.'

> Tenants from Mustang Way property to be transferred to Cottonwood Drive property.

(continued)

6

¶16 The circuit court denied the motion for judgment on the pleadings, explaining:

> Whether the offer varies substantially from the terms of a listing contract is a question of fact that is in dispute in the pleadings. Though the listing contract and the offer are undisputed and are part of the pleadings, whether the variances are substantial may depend upon other relevant facts concerning the transaction or the nature of the business being sold. The inclusion of some conditions in an offer may be a substantial variance in some circumstances and not in others[.]

¶17 The case proceeded to trial. As indicated in the circuit court's decision denying the motion for judgment on the pleadings, one of the issues at trial was whether the offer to purchase contained substantial variances from the listing contract.

¶18 At the jury instruction conference, following extensive discussion, the circuit court determined as a matter of law that the three conditions at issue were not substantial variances from the listing contract. The circuit court reasoned:

> And I think 'substantial variance' has to mean inconsistent with or in direct conflict with. I don't think it can just be any variance, even any difference at all——any difference at all between the listing contract and the offer. Not every variance is a

---

Assumption of leases associated with Mustang Way.

Capital Cartage does not raise these provisions as substantial variances before this court. Its argument before this court is limited to the three conditions at issue. See supra, ¶10.

7

substantial one. And where there's nothing in the contract on a topic and the offer proposes something, that's not a substantial variance as I read the case law.

¶19 Accordingly, the circuit court instructed the jury that "[t]he court has determined that as a matter of law that the provisions in the offer to purchase that the sellers share in the costs of appraisal, that the Hermansons sign non-compete agreements and that Ms. Hermanson continue to work for Capital Cartage after the sale are not substantial variances." The jury found in McNally's favor, requiring Capital Cartage to pay his commission.

¶20 Capital Cartage appealed, arguing that the circuit court erred by denying its motion for judgment on the pleadings. It further contended that the circuit court erred at the jury instruction conference by concluding, as a matter of law, that the three conditions at issue were not substantial variances from the listing contract.

¶21 The court of appeals affirmed the circuit court's entry of judgment on the jury's verdict. McNally v. Capital Cartage, Inc., No. 2015AP2627, unpublished slip op. (Wis. Ct. App. Apr. 27, 2017). In an unpublished decision, the court of appeals concluded "that a substantial variance in this context is limited to variances in offers that directly conflict with express terms in the corresponding listing contract." Id., ¶3.

II

¶22 Capital Cartage argues that the circuit court erred by denying its motion for judgment on the pleadings and in the

alternative, by instructing the jury that the three conditions at issue are not substantial variances as a matter of law.

¶23 A judgment on the pleadings is essentially a summary judgment decision without affidavits and other supporting documents. Jares v. Ullrich, 2003 WI App 156, ¶8, 266 Wis. 2d 322, 667 N.W.2d 843. We determine first whether the complaint has stated a claim. Id. If so, we next examine the responsive pleading to ascertain whether an issue of material fact exists. Id. Judgment on the pleadings is proper only if there are no genuine issues of material fact. Town of Windsor v. Vill. of DeForest, 2003 WI App 114, ¶5, 265 Wis. 2d 591, 666 N.W.2d 31.

¶24 A factual issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co., 2002 WI 80, ¶18, 254 Wis. 2d 77, 646 N.W.2d 777 (citing Baxter v. DNR, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991)). Whether judgment on the pleadings should be granted is a question of law we review independently of the determination made by the circuit court and court of appeals. Jares, 266 Wis. 2d 322, ¶8.

¶25 Likewise, whether jury instructions accurately state the applicable law presents a question of law which we review independently of the determinations rendered by the circuit court and court of appeals. State v. Beamon, 2013 WI 47, ¶18, 347 Wis. 2d 559, 830 N.W.2d 681.

¶26 The court of appeals correctly observed that the resolution of these two issues hinges on the same legal question: whether the three conditions in the offer to purchase are substantial variances from the terms of the listing contract. McNally, No. 2015AP2627, ¶17. Thus, as did the court of appeals, we address this single question. We answer the question only in the context of a sale of a business with real estate where the sale did not go through.[6]

III

¶27 We begin our analysis by setting forth the evolution of the law regarding "substantial variance" between a listing contract and an offer to purchase. Next, we clarify the standard under which courts are to determine questions of substantial variance. Finally, we examine the conditions in the offer to purchase, applying the law as set forth.

A

¶28 Our examination of the law begins in 1944, with this court's decision in Moss v. Warns, 245 Wis. 587, 15 N.W.2d 786 (1944). In Moss, a seller of residential property entered into a listing contract with a broker. Id. at 588-89. The broker procured an offer to purchase the property. Id. at 589.

---

[6] The facts of this case present the sale of a business with real estate where the sale did not go through. Our conclusion here is circumscribed because the ramifications for other types of property sales with other factual scenarios are not before us. Accordingly, we limit our holding to the sale of a business with real estate where the sale did not go through.

10

Stating only, "[w]e decided not to sell.  [A co-owner] would not consent to it," the seller rejected the offer.  Id.

¶29  After the broker brought suit seeking a commission pursuant to the terms of the listing contract, the seller raised as a defense alleged "discrepancies between some of the terms of sale specified in the listing agreement and the terms stated in [the] offer to purchase[.]"  Id. at 590-91.  The court concluded that the seller had waived any objection to the alleged discrepancies because the seller did not bring the discrepancies to the broker's attention when initially rejecting the offer.  Id. at 591-92.

¶30  Moss thus established a rule that "[r]egardless of whether the principal, at the time of his refusal to consummate the transaction, states some grounds or no grounds for such refusal, a particular ground not specified by him at the time is waived and cannot be urged by him when sued [by a broker] for a commission."  Id. at 591 (citing 12 C.J.S., Brokers, p. 224, § 95).  In other words, the Moss court concluded that, in order for sellers to rely on discrepancies between the terms of an offer to purchase and the terms of a listing contract to relieve them from paying a broker's commission, sellers must bring their objections to the broker's attention.

¶31  The holding in Moss was subsequently limited by this court's decision in Kleven, 22 Wis. 2d 437.  In Kleven, as in Moss, a seller rejected an offer to purchase without giving a reason for doing so.  Id. at 441.

11

¶32 The Kleven court concluded that sellers could reject an offer to purchase without giving a reason and without triggering a broker's entitlement to a commission if there were "substantial" variances between the terms of the listing contract and the terms of the offer. Id. at 444. The court reasoned that an insubstantial variance should be brought to a broker's attention to give the broker an opportunity to correct it. Id.

¶33 However, where the variance is substantial, "such as one that is directly in conflict with a material provision of the listing contract, there has been no substantial performance by the broker which would entitle him to his commission, absent acceptance of the offer by the owner." Id. In that situation, the broker is chargeable with knowledge that the substantial variance exists when the offer is submitted. Id. Therefore, "the owner should be under no duty to point this variance out to the broker in rejecting the offer." Id.

¶34 This court purported to apply Kleven in Libowitz, 35 Wis. 2d 74. The Libowitz court summarized the circumstances in which a seller will be relieved of paying a broker's commission following Kleven as follows:

> Summarizing these rules as they apply to the case at hand, the complaint would be demurrable on the ground of failing to state a cause of action if, in spite of liberal construction principles, it alleged variations between the terms of the listing contract and the offer that were: 1. Substantial variations, i.e., 'directly in conflict with a material provision of the listing contract;' 2. Insubstantial, but called to the attention of the broker; or, 3. Insubstantial, but of

12

such a nature that they could not have been remedied by the broker anyway.

Id. at 82-83.

¶35 The court of appeals in this case observed a difference in language between Kleven and Libowitz, to which it ascribed great import. Namely, Kleven used the phrase "such as" when explaining the meaning of "substantial variation," while Libowitz employed "i.e." McNally, No. 2015AP2627, ¶28; Kleven, 22 Wis. 2d at 444; Libowitz, 35 Wis. 2d at 82.

¶36 In the court of appeals' estimation, the case turns on this linguistic idiosyncrasy. It observed, "[t]he Kleven court's use of 'such as' . . . indicated that there are variances that are substantial that do not involve a direct conflict between an offer and the listing contract. If the Kleven court had intended substantial variances to be limited to offer terms in direct conflict with listing terms, the sentence would read: 'where the variance is a substantial one, that is, one that is directly in conflict . . . " McNally, No. 2015AP2627, ¶25.

¶37 Accordingly, the court of appeals concluded "the supreme court in Libowitz modified the Kleven substantial variance language by replacing 'such as' with 'i.e.,' thus, in our view, doing what Kleven did not do. That is, Libowitz limited 'substantial variances' to those involving a direct conflict between the terms of the offer and the terms of the listing contract." Id., ¶26.

13

¶38 We disagree. There is no indication that the Libowitz court intended to modify Kleven. In contrast, when the Kleven court modified Moss, it explicitly stated that it was doing so. See Kleven, 22 Wis. 2d at 445 ("Upon the most careful consideration of the problem we are satisfied that, both with respect to the law which prevails in other jurisdictions, and our own analysis of what the law should be, that the rule of Moss v. Warns [] should be confined to variances which are not substantial, and we so determine.").

¶39 "A court's decision to depart from precedent is not to be made casually. It must be explained carefully and fully to insure that the court is not acting in an arbitrary or capricious manner. A court should not depart from precedent without sufficient justification." Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257; see Leitinger v. DBart, Inc., 2007 WI 84, ¶59, 302 Wis. 2d 110, 736 N.W.2d 1.

¶40 Libowitz provides no justification for departing from Kleven. It contains no explicit pronouncement that Kleven is no longer the standard. The Libowitz court thus evinces no clear intent to depart from Kleven. Instead, the use of "i.e." rather than "such as" or "e.g." appears to be an unfortunate and mistaken editorial choice.

¶41 Consequently, we conclude that Kleven remains the law of this state with regard to determining whether a substantial variance exists between the listing contract and the offer to purchase. Although a term of the offer to purchase that is

14

directly in conflict with the listing contract is a substantial variance, it is not the sole manner in which substantial variance may be shown. Kleven offered direct contradiction as an example, not as a limitation.

¶42 Our decision in Peter M. Chalik & Assocs. v. Hermes, 56 Wis. 2d 151, 201 N.W.2d 514 (1972), is consistent with this result. Chalik was decided post-Libowitz, yet applies the standard from Kleven. Id. at 157-58 (directly quoting Kleven, 22 Wis. 2d at 444, by stating the "such as" standard). By neglecting to observe any conflict or tension between Kleven and Libowitz, the Chalik court implicitly concluded that they present the same standard.

¶43 Further, the pattern jury instruction on the topic also incorporates the Kleven standard. See JI-Civil 3086.[7] The

[7] JI-Civil 3086 provides in relevant part:

Before a real estate broker is entitled to any commission under a real estate listing contract, the broker must procure a purchaser who is ready, willing, and able to meet the express terms of the listing contract. (A seller has the right to reject an offer that does not conform to the terms specified in the listing contract. When a seller refuses to accept an offer which is substantially in accordance with the listing contract, but which contains variances from the terms of the listing contract, the seller to relieve himself or herself from liability for the broker's commission must, when rejecting the offer, point out the variances to the broker so that the broker may be afforded an opportunity to obtain an offer that does comply. However, where the variance is a substantial one, such as one that is directly in conflict with a material provision in the listing contract, then there has been no substantial performance by the broker which would entitle the

(continued)

15

jury instructions committee's comments cite both <u>Chalik</u> and <u>Libowitz</u>, again declining to observe any tension between the standards they present.

B

¶44 Having determined that the <u>Kleven</u> standard applies, we examine next the conditions in the offer to purchase at issue, applying the law as set forth above. Our analysis begins and ends with the condition that Hermanson work without pay for an undetermined period of time following the sale of Capital Cartage. Because we conclude that this condition constitutes a substantial variance, it is dispositive, and we need not address the other two alleged variances.

¶45 A review of the pleadings and attachments indicates that the offer to purchase contains the following condition: "Mary and Rolyn Hermanson agree to operate business as normal until acquisition takes place and for Mary to stay on full time and without pay for period outlined in proposed structure." The "proposed structure" appears to be a reference to the letter of intent, which states: "Seller stays on fulltime for period of 3 months to ensure proper transition. Operates on part time basis at seller discretion for rest of 2014. Part time hourly rate after year 2014 to be negotiated."

¶46 However, the "proposed structure" is not part of the offer to purchase. Addendum A (the last page of the letter of

---

broker to the commission and the owner is under no obligation to specify the reasons for rejection.)

intent) is the sole page of the letter of intent attached to the offer to purchase. The "proposed structure" to which it refers appears on the first page of the letter of intent and was neither attached to nor incorporated into the offer to purchase.[8] By itself the condition in the offer to purchase does not provide any "structure" or temporal limitation on the requirement that Hermanson provide free labor to Capital Cartage.

¶47 We recognize that often a determination of "substantiality" is a factual question for the jury. See JI-Civil 3086. However, here we can decide the question as a

---

[8] The offer to purchase contains an integration clause: "This Offer . . . contains the entire agreement of the Buyer and Seller regarding the transaction." In the presence of such a clause, the court is barred from considering extrinsic evidence of any prior or contemporaneous understandings or agreements between the parties. Tufail v. Midwest Hospitality, LLC, 2013 WI 62, ¶30, 348 Wis. 2d 631, 833 N.W.2d 586. Such a clause indicates that the entire agreement between the parties has been reduced to writing in the offer to purchase. Id., ¶31. The offer to purchase had attached a single page of the letter of intent, but not its entirety. Because of the integration clause, any parts of the letter of intent not attached to the offer are extrinsic and not to be considered.

matter of law by examining the listing contract and offer to purchase only.[9]

¶48  In this case there is no factual determination for a jury to make for two reasons.  First, Chalik establishes that a discrepancy in price between the listing contract and the offer to purchase may be a substantial variance as a matter of law. 56 Wis. 2d at 155.  Second, the condition at issue here is so extraordinary that no reasonable jury could determine that it is not a substantial variance.

¶49  On the first point, our analysis begins with the long-recognized premise that Hermanson's labor has monetary value. See Garstka v. Russo, 37 Wis. 2d 146, 151, 154 N.W.2d 286 (1967) (referring to the "value" of labor); Hoernig v. Hoernig, 109 Wis. 229, 231, 85 N.W.2d 346 (1901) (explaining that labor was "conceded to [be] valuable").  By imposing a condition that Hermanson continue to work for Capital Cartage without pay following the sale of the business with real estate, Erickson saves an amount of money equal to the value of Hermanson's labor.  In other words, by saving Erickson an amount of money equal to Hermanson's salary for the duration of her unpaid work,

---

[9] Unlike the dissent, we do not consider the negotiations between Erickson and Capital Cartage or those parts of the letter of intent not incorporated into the offer to purchase. Erickson was not a party to the listing contract between Capital Cartage and McNally and negotiations between he and Capital Cartage cannot alter its terms.  Likewise, the letter of intent is not binding.  It is not signed and specifically states, "[t]his draft is nonbinding[.]"  See Pinczkowski v. Milwaukee Cty., 2005 WI 161, ¶44, 286 Wis. 2d 339, 706 N.W.2d 642.

the purchase price of the business with real estate is essentially lowered by that same amount.

¶50 As noted above, a variation in price between a listing contract and an offer to purchase may constitute a substantial variance as a matter of law. See Chalik, 56 Wis. 2d at 155. In Chalik, the court observed that the listing contract required a $28,000 down payment, yet the offer to purchase incorporated a down payment of only $22,000. Id. The court determined that this discrepancy was a substantial variance. Id.

¶51 Likewise here, the condition in the offer to purchase that Hermanson work without pay constitutes a substantial variance from the terms of the listing contract as a matter of law. By including Hermanson's free labor and thus in totality proposing a price lower than that reflected in the listing contract, there exists a variance between the desired price as reflected in the listing contract and the price offered. We acknowledge that a specific monetary value for Hermanson's labor is not in the record. Whatever the total amount sufficient to compensate the holdover owner for her work, it likely would

19

eclipse the $6,000 difference the Chalik court determined to be a substantial variance.[10]

¶52 Given the case law, this monetary difference by itself can represent a substantial variance, but we need not rely solely on it. We observe also that the situation here presented Hermanson with a Hobson's choice. If she wanted to complete the transaction, she was left with either working without pay for an undefined period of time or paying a $72,000 commission to McNally. This puts Hermanson in an extreme and unwinnable position.

¶53 A condition of sale requiring a business owner to provide her full time labor and expertise for an undefined period of time without any compensation whatsoever is an extraordinary departure from a listing contract that does not include any labor at all, paid or otherwise, as part of the sale. Even construing the pleadings liberally, this condition that Hermanson provide an unspecified amount of free labor is a significant outlier. There is thus no genuine issue of material fact because no reasonable jury could find that this condition in the offer to purchase constitutes anything other than a

---

[10] Kleven states that an offer term that is directly in conflict with a material provision of the listing contract constitutes a substantial variance. Kleven v. Cities Serv. Oil Co., 22 Wis. 2d 437, 444, 126 N.W.2d 64 (1964). We conclude that under the facts of this case, the variance is substantial as a matter of law. We do not address other factual situations where the difference in price between the offer to purchase and the listing contract may be deemed so de minimus as to not constitute a direct conflict with a material provision.

substantial variance from the terms of the listing contract. See Town of Windsor, 265 Wis. 2d 591, ¶5 (explaining that judgment on the pleadings is appropriate where there is no genuine issue of material fact).

¶54 Accordingly, the circuit court erred in denying Capital Cartage's motion for judgment on the pleadings.[11] By procuring an offer in substantial variance from the terms of the listing contract, there has been no substantial performance by McNally which would entitle him to a commission, absent Capital Cartage's acceptance of the offer. See Kleven, 22 Wis. 2d at 444.

¶55 In sum, Kleven remains the law of this state with regard to determining whether a substantial variance exists between the listing contract and the offer to purchase. Applying the Kleven standard, we conclude, as a matter of law, that in the context of the sale of a business with real estate where the sale did not go through,[12] the condition in the offer to purchase that Hermanson continue to work for Capital Cartage without pay constitutes a substantial variance from the listing contract. Consequently, we determine that McNally did not procure an offer to purchase "at the price and on substantially

---

[11] Our determination that judgment on the pleadings should have been granted is dispositive and we need not further discuss the alternative argument addressing the jury instruction.

[12] We emphasize that our determination in this case is narrowly circumscribed by the particular facts at issue.

the terms set forth" in the listing contract and is not entitled to a commission.

¶56  Accordingly, we reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶57 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting).* While the court would reverse and conclude that no commission is owed as a matter of law, I would reverse and remand for trial. I conclude that it is error for this court, under these facts, to determine as a matter of law that no commission could be due because, in so doing, the court is acting as fact finder and is usurping the role of the jury.

¶58 Competing inferences and conflicting evidence exist in the record as to whether the transition services condition in the offer to purchase would constitute a "substantial variance" from the listing contract. The jury never had the opportunity to weigh and consider this evidence and reach a conclusion based on the law because the trial court took the issue away from the jury when it concluded as a matter of law that this provision could not constitute a "substantial variance." The court here, reaching the opposite conclusion, also takes the issue away from the jury because it concludes, as a matter of law, that this provision must constitute a "substantial variance."

¶59 I disagree with the court because the reality of business transactions, the application of precedent, the specific contractual language at issue here, and the conflicting testimony in the record, all militate in favor of this being a jury question. And, as the court aptly notes, "often a determination of 'substantiality' is a factual question for the jury." Majority op., ¶47 (emphasis added); see also Wis JI—Civil 3086 (1993). Why not here? Just as the trial court

1

invaded the province of the jury, so too does this court. Accordingly, I respectfully dissent.[1]

## I. THE REALITY OF BUSINESS TRANSACTIONS

¶60 The court here concludes as a matter of law that the transition services condition must have value and therefore it must constitute a "substantial variance." Majority op., ¶51. But the fact that such agreements are valuable cannot automatically void the need to pay a commission on the basis that they constitute a substantial variance as a matter of law, because such an interpretation would cause significant uncertainty in business transactions.

¶61 The reality is that business transactions have many moving parts, and the contracts and agreements that are part of the sale of a business are no exception. For example, documents such as transition services agreements are quite common, and can be of such importance that "[a] buyer may decide that, but for transitional support from the seller . . . the deal is not worth doing."[2] Given this significance, it is no surprise that such

---

[1] I do, however, agree with the court's clarification of our precedent that, "[a]lthough a term of the offer to purchase that is directly in conflict with the listing contract is a substantial variance, it is not the sole manner in which substantial variance may be shown." Majority op., ¶41.

[2] Cathy Hwang, Unbundled Bargains: Multi-Agreement Dealmaking in Complex Mergers and Acquisitions, 164 U. Pa. L. Rev. 1403, 1415 (2016); see also Barbara Melby, Considerations in Transition Services Agreements in M&A Transactions, The Legal Intelligencer, Morgan Lewis, Mar. 1, 2016, https://www.morganlewis.com/pubs/considerations-in-transition-services-agreements-in-ma-transactions.

documents might be referenced in an offer to purchase as terms and conditions that must be addressed prior to closing the deal. But they are, and should be, separate and distinct legal documents, and lawyers rather than brokers are the ones to draft them, as they have specific legal requirements. See, e.g., Betten Co. v. Brauman, 218 Wis. 203, 208, 260 N.W. 456 (1935) (holding that restrictive covenants not to compete in connection with the sale of a business are enforceable only so long as they are "reasonably limited, in respect to time, territory, and trade, to the type of business theretofore conducted").

¶62 Additionally, the terms of such agreements often contain enforcement mechanisms and remedies that define the rights of the parties for a reasonable time beyond closing. The fact that the purchaser expects these types of agreements to be a part of a business deal, and signifies as much in the offer, should not, as a matter of law, automatically unwind the deal, or relieve the seller of the requirement to pay the real estate broker's commission. To the contrary, placing the expectations of the parties in the offer to purchase is a reasonable practice because it ensures that there can be a meeting of the minds. If the expectations are acceptable, appropriate documentation can be drafted; if the expectations are unacceptable, they can be further discussed.

¶63 In the case at issue, the purchaser placed a transition services condition in the offer to purchase to ensure a meeting of the minds. Then, without any indication that this expectation was unacceptable, the seller decided to not proceed

3

with the sale. But, instead of acknowledging the reality of business transactions and addressing the thorny factual issue of the parties' expectations, the court concludes, without any undisputed evidence in the record, that the transition services to be provided are of such value that the price offered is not really what it says it is.

¶64 In this regard, I note that there is no evidence in the record as to the value of such services, and that the price offered was to the very dollar that the seller had indicated to the broker was acceptable: $1.2 million. How can the court reach the conclusion that the transition services condition alone constitutes a variance, let alone a substantial one, when the record is devoid of any evidence or testimony as to the value of such services? Majority op., ¶51 ("We acknowledge that a specific monetary value for Hermanson's labor is not in the record."). In my view, the court makes an insupportable leap in concluding that, simply because "labor has monetary value," the transition services condition constitutes a substantial variance in that it serves to offset part of the stated purchase price. Majority op., ¶49.

¶65 As a consequence, the court creates uncertainty in business transactions moving forward because, in reality, its opinion provides little more than an unworkable "smell test": it is virtually impossible to discern when such a condition would not be substantial because the court provides no test, no factors to consider, and no guidance for future cases. This, in turn, makes it more difficult for parties to communicate and

4

negotiate their expectations so as to achieve a meeting of the minds. I cannot accept this conclusion because it breaks with the reality of how business is conducted and usurps the role of the jury.

## II. THE APPLICATION OF PRECEDENT

¶66 It also departs from our precedent, and the proper application of precedent makes it even more difficult to support the manner in which the court reaches its conclusion.

### A. Chalik Is Objectively Distinguishable.

¶67 In Chalik, the listing contract required a $28,000 down payment in a sale-of-business transaction, but the offeror's total down payment was only $22,000. Peter M. Chalik & Assocs. v. Hermes, 56 Wis. 2d 151, 155, 201 N.W.2d 514 (1972). These facts demonstrate an offer that is quantifiably less than the terms of the listing contract. Id. That is not what we have here. Here, the price in the offer to purchase is identical to the price required under the terms of the listing contract: $1.2 million.

¶68 Nonetheless, the court surmises that there is a substantial variance in the price term, because Hermanson's work "likely would eclipse the $6,000 difference the Chalik court determined to be a substantial variance." Majority op., ¶51. There are two flaws in this analysis. First, the court provides no support, evidentiary or otherwise, for its conclusion that Hermanson's transition services "likely would eclipse [] $6,000" in value. Second, even if we assume that her transition services "likely would eclipse [] $6,000," the court's

5

conclusion establishes that a $6,000 difference, regardless of the value of the property at issue, automatically constitutes a substantial variance. Does the court intend the test to be that when the value of a condition "likely would eclipse" $6,000 there must always be a substantial variance? This cannot be. To be clear, I do not disagree that a difference of $6,000, in a $28,000 term of listing, in 1965, was objectively significant. See Chalik, 56 Wis. 2d at 155. It not clear, however, that a difference of $6,000, in a $1.2 million term of listing, in 2014, is equally, or objectively, significant.

¶69 In other words, unlike Chalik, the dollar figure in the term of this listing and the dollar figure in this offer to purchase were identical; and, unlike Chalik——where there can be no real dispute that the dollar figure offered was significantly different than the dollar figure required——the court here, without evidence or testimony, subjectively determines that it knows how to value transitional services and that the value of those services is significant. In so doing, it improperly invades the province of the fact finder.

B.   There Is No "Hobson's Choice" Under Kleven.

¶70 The court goes on to conclude that, although Chalik dictates that "this monetary difference by itself can represent a substantial variance," it need not rely solely on that. Majority op., ¶52. The court then presents a novel theory that the variance is substantial because "the situation here

6

presented Hermanson with a Hobson's choice."[3]  Id.  The court reasons that the transition services condition "puts Hermanson in an extreme and unwinnable position" because she could either work without pay, or pay a $72,000 commission.  Id.

¶71 In Kleven, however, we instructed that the seller always has the option——and sometimes the obligation——to communicate with the broker to explain that an offer is objectionable.  See Kleven v. Cities Serv. Oil Co., 22 Wis. 2d 437, 443-44, 126 N.W.2d 64 (1964).  Such communication provides clarity with regard to whether a variance is substantial and "afford[s the broker] an opportunity of correcting it."  Id. at 444.  But that is not what happened here.  Here, without any communication or explanation, Hermanson decided not to sell.

¶72 Nonetheless, the court surmises that Hermanson had no choice but to work for free or pay $72,000.  There are again two flaws in this analysis.  First, there is no uncontroverted evidence in the record that Hermanson had to take-it-or-leave-it.  Instead, the court interjects its own assumptions that her decision to "not sell at this time" was on this basis, and, in so doing, the court again usurps the role of the jury and assumes facts that are not in the record.  Second, even if Hermanson felt she had to take-it-or-leave-it, she had the

---

[3] A "Hobson's choice" is "an apparent freedom of choice when there is no real alternative," such as being put in the position of having to accept "one of two or more equally objectionable things."  Hobson's choice Webster's Third New International Dictionary 1076 (1986).

7

option to communicate that she was "leaving it" because she found this condition unacceptable.

¶73 In other words, contrary to <u>Kleven</u>, the court concludes that Hermanson had no real choices; and, contrary to what <u>Kleven</u> instructs, Hermanson decided not to sell without any explanation or objection, or offering any opportunity to cure. Not selling is the seller's prerogative, but under the terms of a listing contract, it might have consequences.

### III. THE SPECIFIC CONTRACT LANGUAGE AT ISSUE

¶74 Specifically, I now turn to the contractual language in the case at issue. In general, listing contracts——as with other contracts——can be, and often are, negotiated. A seller might require that, for a broker's commission to be due, the sale must be consummated; others, as here, might use a standard form that requires only that "an offer to purchase is procured . . . at the price and on substantially the terms set forth in [the listing contract] . . . even if Seller does not accept [the] offer." I conclude that the objective terms of the listing contract should control and it is those objective terms, and the conditions of the offer to purchase, that create the issues of fact here.

¶75 The listing contract here,[4] which dictates what McNally had to do to earn a commission, states, in relevant part, as follows:

---

[4] <u>See</u> Form WB-6, available at http://www.wi.ctic.com/Assets/Wisconsin-RRE-CTIC/pdfs/RealEstateForms/WB-6[1].pdf.

TERMS OF LISTING: PRICE: One Million Two Hundred Thousand Dollars (1,200,000.00). . . .

COMMISSION: Seller shall pay Broker's commission, which shall be earned if, during the term of this Listing: . . . 5) An offer to purchase is procured for the Business or included property by the Broker, by Seller, or by any other person, at the price and on substantially the terms set forth in this Listing and the standard provisions of the current WB-16 OFFER TO PURCHASE – BUSINESS WITH REAL ESTATE . . . even if Seller does not accept this offer to purchase. See lines [261-264] regarding procurement. . . . Broker's commission shall be 6% . . . .

Lines 261-264 provide as follows:

PROCURE: A purchaser is procured when a valid and binding contract of sale is entered into between the Seller and the purchaser or when a ready, willing and able purchaser submits a written offer at the price and on substantially the terms specified in this Listing. A purchaser is ready, willing and able when the purchaser submitting the written offer has the ability to complete the purchaser's obligations under the written offer.

The listing contract is dated January 24, 2014, and is signed by Mark McNally (as Agent for Broker) and by Mary Hermanson (as Seller).

¶76 The offer to purchase[5] states in relevant part as follows:

GENERAL PROVISIONS The Buyer, Steven Erickson and/or assigns, offers to purchase the Business known as [Capital] Cartage, Inc. & Capital Moving & Storage.

PURCHASE PRICE: One Million Two Hundred Thousand Dollars ($1,200,000). . . .

---

[5] See form WB-16, available at http://www.wi.ctic.com/Assets /Wisconsin-RRE-CTIC/pdfs/RealEstateForms/WB-16[1].pdf.

DOCUMENT REVIEW/RECEIPT CONTINGENCY . . . This Offer is contingent upon Seller delivering the following documents to Buyer . . . see Addendum A attached.

Addendum A states in relevant part as follows:

- Lender required good faith deposit (approximately $7,500 for appraisal and other costs) is split between seller and buyer once financing is fully approved, commitment letter issued and appraisal ordered. Seller to be reimbursed in full for good faith deposit at closing.

- Covenant agreements not to compete signed by Mary and Rolyn Hermanson (prior to close[6])

- Mary and Rolyn Hermanson agree to operate business as normal until acquisition takes place and for Mary to stay on full time and without pay for period outlined in proposed structure.[7, 8]

The offer to purchase was dated February 15, 2014, and was signed by Steven Erickson (as Buyer). Hermanson never signed the offer, however, and the deal did not close; she also refused to pay McNally's commission. McNally sued.

¶77 At trial, and on appeal, Hermanson challenged the three conditions contained in Addendum A to the offer to purchase as "substantial variances" from the listing contract

---

[6] Closing was set for April 15, 2014.

[7] The "proposed structure" is outlined in the Letter of Intent submitted to Hermanson on February 10, 2014, at a meeting at The Madison Club. See infra ¶¶28-30, 33. The proposed structure was as follows: "Seller stays on full time for period of 3 months to ensure proper transition. Operates on part time basis at seller discretion for rest of 2014. Part time hourly rate after year 2014 to be negotiated."

[8] Presumably, these contingencies were to be dealt with before closing, although the offer to purchase does not identify the number of days within which the transition services agreement must be delivered.

that would relieve her of the obligation to pay McNally's commission. The effect of these three conditions, however, has been interpreted in three different ways by three different courts.

¶78 Recall that the circuit court concluded as a matter of law that these additional conditions of the offer to purchase were <u>not</u> substantial variances. It reasoned that, where a term is omitted from a contract (i.e., where the contract is silent on a topic), that term is not material to the contract. Thus, because the listing contract was silent as to a deposit, a noncompete, and any transition services, there were no substantial variances because the offer here, which "propose[d] something on [those] same topic[s], [is] not affecting a material provision of the listing contract because the listing contract didn't care enough to include it." The circuit court disallowed argument to the contrary and instructed the jury accordingly.[9]

---

[9] The circuit court instructed the jury, in relevant part, as follows:

> A contract to constitute a valid business listing contract must in writing[,] describe the business, express the price for which the same may be sold, the commission to be paid and the period during which the agent or broker shall procure a buyer. The contract must be complete at the time it is signed by the person agreeing to pay the commission. Before a broker is entitled to any commission under a business listing contract the broker must procure a purchaser who is ready, willing and able to meet the express terms of the listing contract. A seller has the right to reject an offer that does not conform to the terms specified in the listing contract.

(continued)

11

¶79 The court of appeals affirmed. McNally v. Capital Cartage, Inc., No. 2015AP2627, unpublished slip op., ¶3 (Wis. Ct. App. Apr. 27, 2017). But the appellate court's reasoning was that Libowitz v. Lake Nursing Home, Inc., 35 Wis. 2d 74, 150 N.W.2d 439 (1967), was dispositive, because Libowitz held that "a substantial variance in this context is limited to variances that directly conflict with express terms in the corresponding listing contract." McNally, No. 2015AP2627, ¶3. Thus, a "substantial variance" cannot "arise from conflicts with

---

When a seller refuses to accept an offer which is substantially in accordance with the listing contract but which contains variances from the terms of the listing contract, the seller to relieve himself or herself from liability for the broker's commission must when rejecting the offer point out the variances to the broker so that the broker may be afforded an opportunity to obtain an offer that does comply. However, where the variance is a substantial one, for example, one that is directly in conflict with the material provision in the listing contract, then there has been no substantial performance by the broker which would entitle the broker to the commission and the owner is under no obligation to specify the reasons for rejection.

The court has determined that as a matter of law that the provisions in the offer to purchase that the seller share in the costs of appraisal, that the Hermansons sign noncompete agreements and that Ms. Hermanson continue to work for Capital Cartage after the sale are not substantial variances.

These jury instructions conform to the form jury instructions, except that "real estate" is replaced with "business" before "listing contract" throughout; and "such as" is replaced with "for example" to introduce direct conflict as a type of a substantial variance. See Wis JI——Civil 3086 (1993).

12

unexpressed but implied terms in a listing contract." Id., ¶40.[10]

¶80 This court now determines the exact opposite of the circuit court and court of appeals, and reverses. And it relies solely on the transition services condition to conclude as a matter of law that, "[b]y imposing a condition that Hermanson continue to work for Capital Cartage without pay following the sale of the business with real estate . . . the purchase price of the business with real estate is essentially lowered by that same amount." Majority op., ¶¶49-50 (citing Chalik, 56 Wis. 2d at 155). In other words, the value of this provision alone results in a substantial variance. Majority op., ¶5.

¶81 Where the trial court concluded as a matter of law that the additional conditions of the offer to purchase were not substantial variances and this court concludes as a matter of law that at least one of them is, and for a different reason, it becomes clear that it is not clear whether the additional terms constitute substantial variances. As such, determination of this issue as a matter of law invades the province of the jury, particularly in light of the fact that often "a determination of 'substantiality' is a factual question for the jury." Majority op., ¶47.

_____

[10] I agree with the court's fine-tuning of Libowitz v. Lake Nursing Home, Inc., 35 Wis. 2d 74, 150 N.W.2d 439 (1967), but that does not eliminate the need for further legal analysis.

13

IV.  THE CONFLICTING TESTIMONY

¶82 Finally, I delve into the competing inferences and conflicting testimony in this record which establish that there are genuine issues of material fact, demonstrating that the court's determination that this is a "substantial variance" as a matter of law invades the province of the jury.

A.  Trial Testimony

1.  The buyer: Erickson's testimony

¶83 Erickson testified that he met with Hermanson on three occasions, only two of which are relevant to the analysis here.[11] The first meeting took place in late January or early February 2014 at Capital Cartage, Inc.'s Cottonwood location; Erickson, Hermanson, and McNally were all present.  Erickson testified that he arrived a little before McNally, and that, while they were waiting, he introduced himself to Hermanson and talked with her about her personal story and the business.  He "thought that the two of [them] hit it off pretty well."  When McNally arrived, they discussed the business financials and how the business was run.  They also discussed how long it would take Erickson to learn the business from Hermanson and Hermanson's intention to retire:

> I asked her a series of questions such as if I was to
> buy this from you, Mary, would this take three months
> for me to figure out with you on board, you kind of

---

[11] The second meeting——not relevant to the analysis——took place in early February 2014 where Erickson, Hermanson, and McNally discussed the draft copies of the 2013 tax returns prepared by Hermanson's certified public accountant, Dennis Kleinheinz.

14

teaching me the ropes if I came on? Would it take a year? We talked . . . about Mary's end intentions after it sold such as are you going to stay in the industry or are you planning on getting out. We talked about that, that she would be selling it and moving on, she would not be involved in the moving industry at all anymore.

Erickson testified that "the way we left that meeting was we were in a very great spot."

¶84 The third meeting took place on February 10, 2014, at The Madison Club; Erickson, Hermanson, and McNally were all present, as was another potential partner of Erickson's, Kevin Wichman. At this meeting, Erickson presented Hermanson with a letter of intent and "walked through [it] kind of line by line with everybody." The price offered was $1.05 million plus $40,000 at the end of 2014 if gross sales were at about 90 percent of what they were at the end of 2013, a package Erickson testified was primarily "an incentive for Mary to . . . come on board" to help with the transition. There were also a number of terms and conditions of sale, all of which, Erickson testified, "were things that had already been discussed between Mary and I and between Mark and I."

¶85 Regarding the transition services condition, Erickson testified that:

Mary agreed to stay on and to help with the transition process. We needed to flush out the terms of that, whether it be my initial idea of if gross sale proceeds are over 950,000 I'll give you $45,000 at the end of the year. Mary had said something like I might only want to work 20 hours a week or I might want to get paid hourly. And I had said things like I understand. We can figure that piece of it out.

\*\*\*

15

> I just wanted Mary there long enough to teach me how to run the business. So this issue over the time that she was going to be there, it was something that we would just have to flush out, work out. It wasn't a deal breaker. It wasn't something either of us were fixated on.

To the contrary, Erickson testified that, "everything that was communicated on from Mary's end at [the Madison Club] meeting was solely regarding the [$1.05 million] purchase price." Ultimately, Erickson raised his price to $1.2 million in his firm offer to purchase dated February 15, 2014.[12] But he heard nothing from Hermanson on this offer, despite repeated attempts to reach out, and on February 18, 2014, he received by email a letter from Hermanson's attorney stating that "[t]he vote was called and the motion to approve the offer to purchase failed to achieve a majority of the shareholders' votes.[13] Capital Cartage has decided not to sell its business at this time."

---

[12] The court notes that the offer to purchase contained an integration clause, which the court concludes bars a circuit court or jury from "considering extrinsic evidence of any prior or contemporaneous understandings or agreements between the parties." Majority op., ¶46 n.8. To support this conclusion it cites Tufail v. Midwest Hospitality, LLC, 2013 WI 62, ¶30, 348 Wis. 2d 631, 833 N.W.2d 586, which dealt with a dispute between a landlord and a commercial lessee regarding the terms of the lease contract. The dispute here is different. First, there are two contracts: (1) the listing contract between McNally and Hermanson; and (2) the offer to purchase between Erickson and Hermanson. Second, the offer to purchase is not the contract directly in issue in this case; rather, the offer to purchase was a contract between Erickson and Hermanson, that Hermanson——the only person party to both contracts——is attempting to leverage to get out of the listing contract with McNally that is at issue. Thus, Tufail is inapposite.

[13] Mary and Rolyn Hermanson are the only shareholders of Capital Cartage, Inc.

16

## 2. The seller: Hermanson's testimony

¶86 Hermanson's testimony regarding their meetings corroborated Erickson's to the extent that she testified that she gave Erickson and Wichman a tour of the Cottonwood location in early February 2014, and that she, Erickson, McNally, and Wichman met on February 10, 2014, at The Madison Club. With regard to the latter, Hermanson testified that she believed the purpose of the meeting was to discuss the value of the building, answer any questions on financials that they might have, and generally find out what they thought the company was worth and if they were really serious about buying it and taking over. When she was presented with a letter of intent, she read it through and testified that:

> [W]hen I got down to the bottom I looked up across at Steve [Erickson] and said, Steve, this will not work for Rolyn and I, and he said, What do you want Mary? I said, Well, this will not work for Rolyn and I.

¶87 She testified that she reviewed the letter of intent again over the next 24 hours making more detailed, handwritten comments and crossing out most of the terms and conditions. With regard to the transition services condition, Hermanson testified:

> I wasn't willing to stay on full-time and most of all, not knowing for how long. I was willing to help. I was willing to help transition a new buyer but I wasn't willing to have a buyer tell me what I was going to be doing with my time.

Next to this term, she said she "made a note that [she] couldn't possibly accept" it, but she did not specifically object to any term at the Madison Club meeting, she never gave this marked up

17

copy to anyone, and she never discussed or asked for changes based on her reservations. The only objection Hermanson made was, as Erickson testified, to the purchase price.

### 3. The broker: McNally's testimony

¶88 McNally began his testimony by providing some background. He testified that he has been a mergers and acquisitions advisor and a business broker for 28 years, and that he has four licenses related to his work: he is a certified public accountant, a certified merger and acquisition advisor, a certified valuation analyst, and a licensed real estate broker. His work involves assisting companies with the sale of their businesses, and, in doing so, he has prepared listing contracts in 280 successful transactions. McNally testified that the listing contract is a form "available from the Department of Regulation & Licensing." He also testified that "the real estate professional doesn't speak with the offer," which is worked out collaboratively between the potential buyer and the seller.

¶89 McNally also confirmed that he had been present for the tour of the Cottonwood location and for the Madison Club meeting where Erickson and Wichman "presented a letter of intent that they had written themselves." He clarified that a "letter of intent is——it's an understanding, it's an agreement that a buyer would use for a business. It doesn't follow the Department of Regulation & Licensing requirements. . . . I cannot do a letter of intent." He did, however, receive a copy

18

of the letter of intent prepared by Erickson and Wichman and thus was privy to the terms and conditions contained therein.

¶90 With regard to the transition services condition, McNally testified that Hermanson never told him that she would not help the buyer of the business in transitioning:

> Actually, it was just the opposite. She struck me as one, wanting to see the business continue and she would be willing to help out for a reasonable period of time given the seasonality of the business.
>
> ***
>
> [S]he was very proud of her company, in getting this established and recognized as one of the premier household storage and moving companies. She wanted to see it successful and she knew that Mr. Erickson didn't have a lot of experience in this industry and she was willing to assist for a period of time to ensure that the business would be properly run.

He testified that it was his impression that Hermanson's primary concern was the price. Here again, he clarified that "[t]he list price is the price that the seller tells the real estate professional this is what I'm going to sell my business for. The asking price can be considerably more because you have to allow for negotiations, so you've rarely come out of the gate with the same price." McNally then testified that:

> [T]he only thing [he and Hermanson] talked about was the price and the price was met, was $1,200,000. There were no objections with these other provisions. Those had been given to Mary. She did not indicate anything on there to me that was a problem other than the purchase price and then we successfully were able to get the purchase price to $1,200,000.

19

B. Genuine Issues Of Material Fact

¶91 This trial testimony demonstrates that there is a genuine issue as to whether assisting Erickson in the transition for a period of time was material to Hermanson, that is, whether the transition services condition had value to her. Erickson testified that Hermanson had been amenable to staying on, under conditions to be determined, to aid in the transition. McNally testified that Hermanson "never told him she would not" be amenable to those conditions. But Hermanson testified that she never agreed to staying on for a to-be-determined period of time to assist in the transition of ownership. This competing testimony creates a genuine issue of material fact as to substantiality because, absent some sort of notice from Hermanson, there is a genuine issue as to whether McNally should have known that she would object to those terms. See Kleven, 22 Wis. 2d at 444. Yet the court concludes that there can be no question that a transition services condition amounts to a substantial variance, because "labor has monetary value." Majority op., ¶49. In doing so, it usurps the role of the jury.

¶92 Additionally, even assuming that the court correctly concluded that Hermanson's transition services had significant value, concluding that their value was accounted for in the final offer also usurps the role of the jury. The record reflects that that Erickson increased his upfront payment offer by $150,000 between the time the letter of intent was distributed at the Madison Club meeting on February 10, 2014, and submitting the firm offer on February 15, 2014. The letter of intent had proposed an offer of $1.05 million upfront, plus

20

$40,000 at the end of 2014 if gross sales were 90 percent of what they were at the end of 2013; the firm offer to purchase was for $1.2 million upfront. The record also reflects that Erickson testified that the lower upfront amount in the letter of intent was primarily "an incentive for Mary to . . . come on board" to help with the transition. And Hermanson testified that her only comment on the letter of intent was that "this will not work for Rolyn and I." There are at least two inferences that could be drawn from this record: (1) that the $150,000 increase was for the business;[14] or (2) that this $150,000 increase was an upfront payment for Mary's transition services. The court, in determining this as a matter of law, selects one of these options over the other. But we are not the fact finder, and the one the court selects is only an inference that <u>may</u> be drawn from the facts, not a conclusion compelled as a matter of law. Thus, even assuming that the court correctly concluded that Hermanson's labor had material value, and that that value is accounted for in the final price offered, it acted as jury, not judge, in doing so.

¶93 In sum, the question of substantiality may not here be determined as a matter of law because "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Majority op., ¶24 (citing <u>Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.</u>, 2002 WI 80, ¶18, 254 Wis. 2d 77, 646

---

[14] In this regard, McNally also testified that he never told Erickson that the price term of the listing contract was $1.2 million.

N.W.2d 777). As such, the jury should consider this testimony, be given the proper jury instructions, and then reach a verdict. Thus, I would remand to the circuit court for a jury to determine whom to believe about whether the transition services condition had value, what that value was, and whether it was so valuable that that McNally is rightfully deprived of his commission because he was "chargeable with [the] knowledge" that an offer submitted with that condition would be unacceptable to Hermanson. Kleven, 22 Wis. 2d at 444.

## V. CONCLUSION

¶94 I dissent because, in my view, it was error for this court to conclude as a matter of law that the transition services condition in the offer to purchase constitutes a substantial variance from the listing contract such that no commission could be due.

¶95 First, concluding as a matter of law that the transition services condition is a substantial variance because a valuable condition effectively lowers an offered purchase price ignores the reality that, in business transactions, valuable terms and conditions are regularly included in offers to purchase as a means of communicating the expectations of the parties moving forward. Second, reliance on Chalik and Kleven to support this conclusion is misplaced because unlike Chalik, the majority has no quantifiable evidence of a difference in value and no objective evidence that any difference is substantial. Additionally, contrary to Kleven, Hermanson had options other than working for free or paying $72,000, namely,

22

she had the option of communicating the unacceptableness of the transition services condition to McNally.

¶96 Third, the disagreement among the courts as to whether and why the transition services condition is a substantial variance under the specific terms of this listing contract counsels that a conclusion as a matter of law improperly invades the province of the fact finder, particularly considering that determinations of substantiality are often a matter for the jury. Fourth, that this is more properly a matter for the jury is confirmed by the competing inferences and conflicting testimony apparent in the record.

¶97 In sum, I fear that the conclusion of the court could cause increased difficulty in determining when a dispute is properly an issue for the jury, when a commission might ever be due, and how a court should analyze conditions common to business transactions when they have been referenced in an offer to purchase. Thus, although, like the court, I would reverse, I would reverse on other grounds and remand for trial. Accordingly, I respectfully dissent.